UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| **BRISTOL HEALTH CARE** | ) | |
| **INVESTORS, LLC**, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | NO. 2:13-CV-137 |
| | ) | |
| **MARK EMKES**, Commissioner, Tennessee | ) | |
| Department of Finance and Administration, | ) | |
| In his official capacity only; | ) | |
| | ) | |
| **DARIN GORDON**, Deputy Commissioner, | ) | |
| Bureau of TennCare, | ) | |
| Department of Fiance and Administration, | ) | |
| In his official capacity only; and | ) | |
| | ) | |
| **JOHN J. DREYZEHNER**, Commissioner, | ) | |
| Tennessee Department of Health, In his | ) | |
| official capacity only, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On May 1, 2013, the Centers for Medicare & Medicaid Services, Department of Health and

Human Services ("CMS"), informed the petitioner that its nursing home facility "was not in substantial

compliance with the participation requirements" of Medicare and Medicaid and that conditions

"constituted immediate jeopardy and substandard quality of care" to patients. [Doc. 1-1 at 34]. CMS

further informed Bristol Health Care that its Medicare provider agreement would be terminated on May

15, 2013, and that Medicare and Medicaid payments for services rendered to those residents would

continue "up to a 30-day period in order to facilitate the orderly transfer/relocation of residents," that is,

through June 14, 2013. [*Id.*]. Petitioner was informed of its right to request a hearing before an

administrative law judge of the Department of Health and Human Services "no later than 60 days from receipt" of the letter. [Doc. 1-1 at 36-37].

On May 8, 2013, the petitioner, Bristol Health Care Investors, LLC ("Bristol Health Care"), filed a petition for temporary restraining order and for injunctive relief, [Doc.1-1 at 7-27], in the Law Court for Sullivan County, Tennessee, at Bristol against Mark Emkes, Commissioner, Tennessee Department of Finance and Administration, Darin Gordon, Deputy Commissioner, Bureau of TennCare, Department of Finance and Administration, and John J. Dreyzhner, Commissioner, Tennessee Department of Health (the "State Defendants"). The petition sought a temporary restraining order, preliminary injunction and permanent injunction to prevent the State Defendants from "prematurely" terminating Bristol Health Care's Medicaid provider agreements and "prematurely" discharging its Medicaid residents from Bristol Health Care's Bristol nursing home. The Law Court on the same day granted Bristol Health Care's motion for a temporary restraining order and enjoined the State Defendants from (1) revoking Bristol Health Care's Medicaid billing privileges or implementing termination of its Medicaid provider agreements; (2) providing notice of termination of Medicaid payments or requiring Bristol Health Care to provide notice of termination to Medicaid residents; (3) contacting Bristol Health Care's Medicaid residents concerning the involuntary termination at issue and the relocation related thereto; and (4) any and all efforts to relocate Medicaid residents or requiring Bristol Health Care to involuntarily relocate Bristol Health Care's Medicaid residents, until such time as Bristol Health Care's rights to a hearing and appeal have been exhausted or the issue becomes moot, [Doc. 1-1 at 121-123]. The Law Court scheduled a hearing on petitioner's motion for preliminary injunction for May 23, 2013.

On May 20, 2013, the State Defendants filed a notice of removal pursuant to 28 U.S.C. §§ 1441(a) and 1446, alleging that Bristol Health Care's claims arise under federal law, and the case therefore presents federal questions. On May 22, 2013, Bristol Health Care moved for an extension of

the temporary restraining order, [Doc. 5], and, after a response in opposition by the State Defendants, [Doc. 8], the Court granted the motion, extended the temporary restraining order entered by the State Court to May 30, 2013, and scheduled a preliminary injunction hearing on that same day, [Doc. 10]. On May 28, 2013, the State Defendants filed a motion to dismiss, [Doc. 11], which is not yet ripe for disposition, and their response in opposition to the preliminary injunction request, [Docs. 13, 14, 15, 16, 17, 18, 19]. Pursuant to 28 U.S.C § 517, the United States has also filed its statement of interest, [Doc. 20]. Petitioner has now replied, [Doc. 22].[1]

On May 30, 2013, the Court held its scheduled hearing on petitioner's motion for a preliminary injunction. The parties appeared through counsel along with Assistant United States Attorney Suzanne H. Bauknight for the interested party, the United States. All parties stood on the previously filed affidavits and declarations, no additional proof was offered by any party, and the Court heard oral argument. For the reasons which follow, the petitioner's motion for a preliminary injunction will be DENIED. [2]

---

[1] Petitioner complains in its reply about the short time allowed by the Court for petitioner to file a reply brief and further complains that the State Defendants and the United States waited eight and ten days, respectively, after removal to file their briefs. The Court simply notes that Bristol Health Care never filed a formal motion for a preliminary hearing and never filed a brief in either the state or this Court prior to the Court's May 30 hearing.

[2] In petitioner's motion for an extension of the temporary restraining order entered by the Law Court Judge, the petitioner suggested that the case was not properly removable to this federal court from the state court and restated that position at oral argument on the motion for preliminary injunction. The petitioner has not, however, filed any motion to remand to the state court, although its time for doing so has not expired. Because the matter has not been formally raised in a motion, the Court has not thoroughly considered the question. At first glance, however, it appears to the Court that the case was properly removed by the State Defendants to this Court.

Generally speaking, any civil action brought in a state court may be removed to the United States District Court if the district court would have had original jurisdiction over the case. In other words, "[o]nly state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). Absent diverse parties (or one of the other rarely relied upon grounds found in 28 U.S.C. § § 1442-1444), a defendant may remove the action to federal court only if the plaintiff's claim "aris[es] under" federal law. *Mikulski v. Centerior Energy Corp*., 501 F.3d 555, 560 (6th Cir. 2007) (*en banc*). The removing party generally has the burden of establishing that jurisdiction exists. *See Brittingham v. General Motors Corp*., 526 F.3d 272, 277 (6th Cir. 2008).

In "determ[ing] whether [a] claim arises under federal law," the Court looks only to the "well-pleaded allegations of the complaint and ignore[s] potential defenses" that defendant may raise. *Mikulski*, 501 F.3d at 560. The well-pleaded-complaint rule focuses on what the plaintiff alleges, no matter how the plaintiff casts his allegations, to determine whether

## I. Statutory and Regulatory Background

The Medicare and Medicaid programs were created by Titles XVIII and XIX of the Social Security Act.  Medicaid is a state/federal insurance partnership, primarily for certain groups of low-income people.  Medicaid is jointly financed by states and the federal government.  The federal government currently pays roughly two-thirds of all Medicaid payments for covered benefits delivered to eligible beneficiaries.  Medicaid is administered by states pursuant to a state plan which is approved by the Centers for Medicare & Medicaid Services ("CMS").  States must comply with federal law and regulations in order to receive federal matching funds for covered benefits provided to eligible enrollees. [Doc. 16, ¶ 7].

The Medicaid program provides medical assistance, including nursing facility benefits, to low-income recipients.  A nursing facility that provides care to Medicare beneficiaries and/or Medicaid recipients must comply with an extensive set of health and safety standards prescribed by federal statute and regulations that are common to both programs and must ensure for residents the "highest practicable physical, mental, and psychosocial well being" by providing care that addresses medical, nursing and psychosocial needs.  42 U.S.C. § 1395i-3(a)-(b) (Medicare); 42 U.S.C. § 1396r(a)(3)(b)-(d) (Medicaid). [Doc. 20 at 3].

A nursing home participating in the Medicaid program is required to enter into a provider agreement with the designated (by federal authorities) state agency responsible for administering the

---

or not they ultimately involve a federal question, *i.e.*, whether they arise under the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 1331.  Federal question jurisdiction extends to ostensible state law claims that (1) necessarily depend on a substantial and disputed federal issue, (2) are completely preempted by federal law, or (3) are truly federal law claims in disguise.  *See Mikulski*, 501 F.3d at 560.

In this case, petitioner makes specific claims under the due process clause of the United States Constitution, § 6501 of the federal Affordable Care Act, and under its Medicaid Provider Agreement.  These claims, no matter what they are called by the petitioner, arise under the federal Medicaid and Medicare statutes, created by Titles XVIII and XIX of the Social Security Act.  Medicare is a fully funded federal program and Medicaid is jointly funded federal and state program with the federal government providing approximately two-thirds of the funding.

state's Medicaid program. In Tennessee, that agency is the Department of Finance and Administration, Bureau of TennCare. Bristol Health Care has entered into such an agreement with the Tennessee agency. [Doc. 1-1 at 9]. The State of Tennessee does not impose Medicaid requirements that exceed those of Medicare and a facility that meets the requirements to participate in the Medicare program also meets the requirements to participate in the Medicaid program. [Doc. 16 at 4]. Likewise, a nursing home that does not meet the requirements to participate in the Medicare program does not meet the requirements to participate in the Medicaid program. [*Id*. at 5]. Most facilities, including Bristol Health Care's Bristol facility, are "dual certified," meaning that they meet the federal participation requirements to participate in both the Medicare and Medicaid programs. [*Id.*].

Medicare is a federal health insurance program for individuals age 65 and older and those under 65 with disabilities and end-stage renal disease. Medicare does not cover nursing facility services; however, Medicare benefits do include skilled nursing facility services for Medicare beneficiaries who need the skilled nursing or rehabilitation services. Nursing homes are paid directly by CMS for Medicare covered services furnished Medicare beneficiaries, and the state makes payment to the nursing home, or, in Tennessee's case, to a managed care organization, for Medicaid covered services provided to eligible Medicaid residents. To receive payments under either program, a nursing home must be periodically "certified" through on-site inspections, called "surveys," as meeting the health and safety requirements specified in the relevant statutes and regulations. 42 U.S.C § 1395i-3(a)(3), (b)-(d), (g) (Medicare); 42 U.S.C. § 1396r(a)(3), (b)-(d), (g) (Medicaid).

The Secretary of Health and Human Services has entered into agreements in each state with a State Survey Agency to determine whether skilled nursing facilities meet the federal participation requirements for Medicare and the same agency performs the same survey task for facilities participating in the Medicaid program and certifies the facility's compliance or noncompliance with federal

participation requirements for both programs. For dually certified facilities, the state agency conducts the survey, certifies compliance or noncompliance with federal participation requirements, and recommends to CMS remedies that are consistent with the parameters set forth in federal regulation. [Doc. 16 at 5]. Upon a finding that a facility's deficiencies "immediately jeopardize the health or safety of its residents," the Secretary of Health and Human Services must "take immediate action to remove the jeopardy and correct the deficiencies . . . or terminate the facility's participation . . ." 42 U.S.C. § 1395i-3(h) (Medicare); 42 U.S.C § 1396r(h) (Medicaid). "Immediate jeopardy" is defined as a "situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. Where CMS terminates a Medicare provider agreement based on an immediate jeopardy to resident health or safety, the state must either terminate a dually participating facility's Medicare and Medicaid provider agreements within 23 days of the last date of the survey or appoint a temporary manager to remove the immediate jeopardy. Under federal regulation, the state must provide for the safe and orderly transfer of residents when the facility's participation in the programs is terminated. [Doc. 16 at 6, 8].

A dually certified nursing home that is subject of enforcement action following a determination of noncompliance may seek review only through the Medicare Administrative Appeals Procedures in 42 C.F.R. Part 498. *See* 42 C.F.R. §§ 498.4, 431.153(g), 488.330(e)(3)(ii). Those appeal rights are extensive and include the right to an in-person hearing, 42 C.F.R. 498.5(b), the right to request subpoenas, 42 C.F.R. § 498.58, and the right to request expedition of the administrative hearing. With the exception of civil monetary penalties, remedies imposed to protect residents remain in effect pending administrative appeal proceedings. *See* 42 U.S.C § 1395i-3(h)(5); 42 C.F.R. § 488.330(e)(1)-(2). Only after the administrative appeal process has been completed may a nursing home seek judicial review of termination decisions. *See* 42 U.S.C. § 1395cc(h)(1) (incorporating 42 U.S.C. § 405(g)).

## II. Relevant Facts

Bristol Health Care operates a nursing home known as Bristol Health and Rehabilitation Center which sits on the state line between Tennessee and Virginia with half of the facility located in each state. The facility is licensed by the Tennessee Department of Health for 120 beds and by the Virginia Department of Health for 120 beds. As of the date of the filing of the state court complaint, the facility had 101 residents. Bristol Health Care directly employs 81 people (76 full-time and 5 part-time). The facility contracts with therapy, dietary and laundry/housekeeping services that employ additional people who work at the facility. Of the 101 total residents at the facility, 23 are Medicare residents, 26 are Tennessee Medicaid/TennCare residents, 32 are Virginia Medicaid residents, 11 are private pay residents, 4 are hospice residents and 5 residents are "pending" a classification.

Bristol Health Care and its predecessors-in-interest have operated for over 40 years. For the last year and half, however, the facility has a record of noncompliance and inability to sustain compliance with applicable regulations. Following a complaint on November 7, 2011, the Tennessee Department of Health's Division of Health Care Facilities conducted an investigation. Immediate jeopardy and substandard quality of care were found at the facility, findings which resulted from numerous incidents including falls by 8 of 16 residents reviewed, with one resident suffering a broken femur and another receiving a closed head injury resulting in death, and failure to develop and implement interventions to prevent falls for the 8 residents. On November 15, 2011, CMS issued a notice of imposition of penalties, including a civil monetary penalty and discretionary denial of payment for new admissions and discretionary termination. Bristol Health Care was assessed and paid a monetary penalty in the amount of $237,770 and submitted a plan of correction to regain substantial compliance with federal requirements on November 30, 2011. As a result of these events, Bristol Health Care's facility was designated as a "Special Focus Facility" by CMS on January 30, 2012. The Special Focus Facility

program focuses on nursing facilities with a history of substandard quality of care. When a nursing facility is so designated, the facility is subject to twice the number of standard surveys and progressive enforcement actions. As of April 18, 2013, Bristol Health Care's facility has been in the Special Focus Facility program for 15 months.

The first survey of Bristol Health Care's facility following its designation as a Special Focus Facility occurred on March 26-31, 2012. This survey resulted in citations for immediate jeopardy at a "K" level, which is a pattern of harm that is immediate jeopardy, and for substandard quality of care. A formal notice of certification of noncompliance with the federal conditions of participation was issued to the facility on April 5, 2012, and notice of termination was provided on April 10, 2012, with the opportunity to correct the deficiencies. The immediate jeopardy citations were lifted effective April 11, 2012, with the remaining health and safety deficiencies corrected by May 11, 2012. So far as the Court can tell, the precise nature of the deficiencies found in March, 2012, are not contained in the record.

In September, 2012, a standard survey of Bristol Health Care's facility was completed with certain deficiencies found but no immediate jeopardy. Then, on March 4-6, 2013, a survey was completed which reported 12 health deficiencies. One cited deficiency identified actual harm for a resident due to significant weight loss. A subsequent investigation on April 18-22, 2013, after a complaint, again resulted in findings of immediate jeopardy and substandard quality of care. There were two incidents that gave rise to the findings: (1) On December 6, 2012, "[a]ccording to statements from employees of Bristol [Health Care], including the facility Administrator, the Director of Nursing, nurses and a member of the housekeeping staff, a Registered Nurse had placed tape across a resident's mouth in order to keep the resident quiet." Although the registered nurse was terminated because of the incident, the facility administrator did not believe the incident to be abuse and did not report it beyond the corporate level; and (2) on March 30, 2013, a resident reported to two certified nurse assistants

employed at Bristol Health Care's facility that the resident had seen another certified nurse assistant having sex with a resident. The second resident had a diagnosis of senile dementia, altered mental status and schizophrenia. The medical records of the resident did not indicate she was sent to the emergency room for evaluation, nor was any external vaginal examination done by nursing staff. Two days passed before a nurse practitioner was paged to do a vaginal examination of the resident. After the report of the incident, the alleged perpetrator was allowed to work a full 12 hour shift on the day of the alleged incident and the director of nursing was not made aware of the incident until April 1. The RN to whom the CNAs reported the incident did not immediately notify the facility director or the director of nursing, did not suspend the subject CNA and did not send the resident to an emergency room for sexual abuse or forensic testing.

On April 24, 2013, the Division of Health Care Facilities issued an initial notice to Bristol Health Care regarding the findings of immediate jeopardy and substandard quality of care. On April 26, the Division of Health Care Facilities issued a formal notice of certification of noncompliance with federal conditions of participation. By a letter dated April 29, Bristol Health Care submitted its first allegation of compliance asserting that the immediate jeopardy deficiencies as a result of the April investigation had been corrected. On the same day, Bristol Health Care submitted a plan of correction which proposed methods by which the deficiencies identified in the April investigation that had not yet been corrected would be resolved. By letters dated May 7 and 17, 2013, the Division of Health Care Facilities notified Bristol Health Care that the allegation of compliance was unacceptable and that its plan of correction was unacceptable.

On April 30, 2013, the Tennessee Department of Health notified Bristol Health Care that admissions were suspended and assessed monetary penalties. As set forth above, CMS gave notice of involuntary termination of Bristol Health Care's participation in the Medicare program as a skilled

nursing facility and in the Medicaid program as a nursing facility on May 1, 2013, citing the deficiencies found in the April, 2013 survey. The CMS notice does not mention Bristol Health Care's Medicaid provider agreements with either Virginia or Tennessee.

On May 2, 2013, the director of the Division of Health Care Facilities sent an e-mail to Bristol Health Care notifying the facility of a conference call to be held the following day to discuss the relocation of residents. Bristol Health Care was directed to gather information and supply a list of residents to be transferred, including contact information so that the state could directly contact residents and their responsible parties about relocation. On May 3, 2013, during the conference call, Bristol Health Care was notified that (1) all residents of the facility, both Medicare and Medicaid residents, would be involuntarily discharged on May 15, 2013, prior to any appeal, and (2) outlined the process by which residents would be relocated. Bristol Health Care informed the government officials involved in the conference call that Bristol Health Care intended to file an appeal of the May 1, 2013 involuntary termination letter. That appeal was filed on May 6, 2013, and Bristol Health Care requested an expedited review of its appeal. On April 30, 2013, the Commissioner of the Tennessee Department of Health notified the facility of a suspension of admissions and prohibited any further TennCare admissions after April 30. Bristol Health Care appealed the suspension of admissions on May 6, 2013, and filed a request for informal dispute resolution pursuant to 42 C.F.R. § 488.31. Bristol Health Care also requested an expedited hearing on this appeal.

## III. Preliminary Injunction Standard

The Court must consider four factors in determining whether to grant a preliminary injunction:

> (1) whether the plaintiff has a strong likelihood of success on the merits;
>
> (2) whether, without the injunction, the plaintiff will suffer irreparable harm;
>
> (3) whether issuance of the injunction will cause substantial harm to the defendants or

others; and

(4) whether the public interest would be served by the issuance of a preliminary

injunction.

*Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009); *United Food and*

*Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 347 (6th Cir.

1998). These factors are not prerequisites to the issuance of an injunction but are factors to be balanced

in considering whether to grant the injunction. *United Food and Commercial Worker's Union*, 163 F.3d

at 347.

A preliminary injunction is an extraordinary remedy and an exercise of a court's equitable

authority. *Salazar v. Buono*, 130 S.Ct. 1803, 1816 (2010); *Winter v. National Resources Defense*

*Counsel*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction must "demonstrate a clear

entitlement to the injunction under the given circumstances." *Entertainment Productions., Inc. v. Shelby*

*County*, 545 F.Supp.2d 734, 740 (W.D. Tenn. 2008). "[T]he proof required for the plaintiff to obtain a

preliminary injunction is much more stringent than the proof required to survive a summary judgment

motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

The balance of factors in this case clearly indicate that Bristol Health Care cannot establish its

entitlement to a preliminary injunction in the case. Bristol Health Care has little or no likelihood of

success on the merits of its case; it cannot establish irreparable harm in the absence of an injunction, the

issuance of an injunction would potentially cause substantial harm to the Medicare and Medicaid

residents of the facility and to the State of Tennessee; and an injunction would not serve the public

interest in this case. The substandard care at this facility over the last year and a half has posed a

substantial risk to the residents of the facility, and the April, 2013 allegations, if true, and petitioner has

offered nothing to the Court to suggest that they are not, also pose an immediate risk of harm to the

facility's residents. For all these reasons, discussed in more detail below, the motion for a preliminary injunction must be denied.

## IV. Analysis and Discussion

### A. The Likelihood of Success on the Merits

"To obtain a preliminary injunction, a plaintiff must demonstrate, among other things, a strong or substantial likelihood or probability of success on the merits." *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 35 (6th Cir. 1992). This Bristol Health Care cannot do so for a very simple reason--this Court lacks subject matter jurisdiction over Bristol Health Care's claims. Lack of subject matter jurisdiction is a non-waivable, fatal defect which may be raised by any party at any time, including being raised *sua sponte* by this Court. *Von Dunser v. Aronoff*, 915 F.2d 1071, 1074 (6th Cir. 1990). The petitioner has the burden of proving subject matter jurisdiction.

Claims "arising under" the Medicare statute are subject to clear limits as to jurisdiction established by Congress. Those claims may be brought only through established federal administrative procedures which require presentation to the appropriate federal agency, exhaustion of administrative remedies and the issuance of a final decision before a plaintiff may seek judicial review by a federal court. Section 405(h) of the Social Security Act, made applicable to the Medicare Act by 42 U.S.C. § 1395ii, states:

> No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the [Secretary] or any officer or employee thereof shall be brought under § 1331 or 1356 of title 28 to recover on any claim arising under this subchapter [i.e., the Medicare Act].

42 U.S.C. § 405(h). The remedies outlined in § 405(g) are "the exclusive source of federal court jurisdiction over cases involving [programs under the Social Security Act]." *Jackson v. Astrue*, 506 F.3d

1349, 1353 (11th Cir. 2007) (citations omitted). In *Shalala v. Illinois Council On Long Term Care, Inc.*, the Supreme Court held that a nursing home provider's challenge to Medicare regulations could not be brought under 28 U.S.C. § 1331, holding that such a challenge must be "channeled through" the review provisions of the Medicare Act. 529 U.S. 1, 10, 13 (2000); *see also Heckler v. Ringer*, 466 U.S. 602, 605 (1984) (observing that "[j]udicial review of claims arising under the Medicare Act is available only after the Secretary renders a 'final decision' on the claim"); *BP Care, Inc. v. Thompson*, 398 F.3d 503, 509 (6th Cir. 2005) (finding that district court lacked jurisdiction under 28 U.S.C. § 1331 to review Medicare provider's challenge to agency's successor liability policies).

The language of § 405(h) has been broadly construed to "include any claims in which 'both standing and the substantive basis for the presentation' of the claims" is the Medicare Act. *Ringer*, 466 U.S. at 615 (quoting *Weinberger v. Salfi*, 422 U.S. 749, 760-61 (1975)). In *Illinois Council*, the Supreme Court made it clear that the bar on federal question jurisdiction applies "irrespective of whether the individual challenges the agency's [decision] on evidentiary, rule-related, statutory, constitutional, or other grounds." *Illinois Council*, 529 U.S. at 10. While these rules may seem harsh when applied to an individual or entity such as Bristol Health Care, and impose hardship, the Court found that it was justified "[i]n the context of a massive, complex health and safety program such as Medicare" . . . and, "[i]n any event, such was the judgment of Congress as understood in *Salfi* and *Ringe*r." *Id*. at 13.

Although Bristol Health Care appeared to acknowledge at oral argument that § 405(h) provides its only avenue of review of its termination from participation in the Medicare/Medicaid programs, it argues that this Court has the authority to impose an injunction to maintain the *status quo* while the appeals are pending, relying primarily on a series of district court decisions from the Western District of Missouri, *Lexington Management Company, Inc. v. Missouri Department of Social Services v. United States Department of Health and Human Services*, 656 F.Supp. 36, (W.D. Mo 1986), the

District of Columbia, *International Long Term Care, Inc. v. Shalala*, 947 F.Supp. 15 (D. D.C. 1996), the

District of Massachusetts, *Mediplex of Massachusetts, Inc. v. Shalala*, 39 F.Supp.2d 88 (D. Mass. 1999),

and this court's decision in *Frontier Health, Inc. v. Shalala*, 113 F.Supp.2d 1192 (E.D. Tenn. 2000). In

*Frontier Health*, Judge Hull granted the motion of Frontier Health d/b/a Woodridge Hospital for a

preliminary injunction enjoining the Secretary of Health and Human Services from terminating

Woodridge's participation in the Medicare or Medicaid programs until the administrative appeal process

had been exhausted. *Id*. at 1194. *Frontier Health* was decided shortly after the Supreme Court's

decision in *Illinois Council*, and Judge Hull found *Illinois Council* not to be controlling, holding instead

that *Illinois Council* "does not address the court's powers to grant preliminary injunctive relief" and

"seems to suggest that such power does exist . . . if the Secretary's actions have the practical effect of

totally denying the possibility of later judicial review." *Id*. at 1193. Judge Hull determined that "[i]f

Woodridge Hospital were forced to close down before its administrative remedies had been exhausted,

it would not be in a position to seek judicial review at the close the administrative process." *Id*.[3]

To the extent the *Illinois Council* case left open the question of whether or not the court

has power to grant preliminary injunctive relief until the administrative appeal process has been

exhausted, that door appears to have been slammed shut by the Sixth Circuit in *Cathedral Rock of North*

*College Hill, Inc. v. Shalala*, 223 F.3d 354 (6th Cir. 2000), decided less than four months after *Frontier*

*Health*. In *Cathedral Rock*, a dually certified nursing facility, in circumstances remarkably similar to

those in this case, sought declaratory and injunctive relief in federal district court against the Secretary

of Health and Human Services challenging the determination that it was not in substantial compliance

---

[3]  It is not clear to the undersigned what the basis for Judge Hull's finding in this respect was. Clearly, under §
405(h) Woodridge Hospital and other entities like it could in fact have sought judicial review after the exhaustion of its
administrative remedies. It may be that Judge Hull was referring to his finding that Woodbridge would be required to close
its doors if the injunction was not granted.

with program requirements and the imposition of remedies, including termination of its participation in those programs. The plaintiff in *Cathedral Rock* sought a temporary restraining order from the district court to restrain temporarily the Secretary from terminating the provider agreements and refusing to make payments "pending the outcome of an administrative hearing." *Id*. at 357-58. The Sixth Circuit's holding was clear and unequivocal. The district court lacked subject matter jurisdiction, and the facility was required to exhaust its administrative remedies before seeking judicial review of the Secretary's determinations, the facility was not entitled under the due process clause to a pre-termination hearing, and the facility was required to obtain review of the Secretary's actions through the Medicare administrative appeals procedure.

Noting that the Medicare/Medicaid Acts impose common certification and quality of care requirements on nursing facilities, that termination of Medicare and Medicaid participation is imposed upon dually certified nursing facilities that are not in compliance with these requirements, and that the appeals procedure set forth for reviewing the Secretary's determinations affecting participation in the Medicare program also apply to termination of a facility's participation in a Medicaid provider agreement, the court concluded that "when a dually certified facility challenges a determination that it is not in substantial compliance with the common Medicare and Medicaid regulations and a termination of its participation in both programs, the facility must seek review of this determination through the Medicare administrative appeals procedure." *Id.* at 366. The court explicitly held that a dually certified facility may not avoid this jurisdictional bar by simply characterizing its action as arising under the Medicaid Act or, by implication, recasting its action as one against state officials who administer a federal program rather than against the appropriate federal officials. *Id*. at 367.

In short, it appears beyond reasonable dispute to the Court that petitioner's claims in this case, "arise under" the Medicare Act and are inextricably intertwined with Medicare determinations. As

a result, as *Cathedral Rock* makes clear, this District Court lacks subject matter jurisdiction.[4]

Furthermore, the Court finds nothing in the final district court decision called to the Court's attention by

the petitioner, *Peak Medical Oklahoma No. 5, Inc. v. Sebelius*, 2010 WL 4809319 (N.D. Okla. Nov. 18,

2010) which would change this Court's analysis. In *Peak*, the district court had enjoined the Secretary

from terminating Medicare/Medicaid payments to the plaintiff pending the outcome of its administrative

appeal. The court, however, ultimately granted the Secretary's motion to dismiss for lack of subject

matter jurisdiction and dissolved the restraining order. Peak moved for an injunction pending appeal

granting the same relief as the prior temporary restraining order. Noting "conflicting case law regarding

a court's ability to grant preliminary injunctive relief pending the outcome of an administrative appeal

brought under the Medicare Act," the district court granted the injunction pending appeal. *Id.* at *2.[5]

Although the district court found the Sixth Circuit's analysis in *Cathedral Rock* and similar cases "more

persuasive and applicable to the facts" in the case, it noted that the Tenth Circuit had not yet weighed

in on the issue, a factor weighed in favor of the grant of injunctive relief pending appeal to the Tenth

Circuit. *Id.* Given that the holding of *Cathedral Rock* is binding on District Courts sitting in the Sixth

Circuit, the *Peak Medical* decision has no precedential value and is likewise not persuasive on the issue

before the Court.

---

[4] Petitioner's reply suggests that *Frontier Health* and *Cathedral Rock* are not inconsistent and turned on the question of whether petitioner would remain economically viable during the appeals process such that it could receive full relief if awarded retroactively. In other words, petitioner suggests that the reason injunctive relief was available to Frontier Health but was not to the petitioner in *Cathedral Rock* is that one, Frontier Health, would be forced to close if the injunction was not granted while the other was financially sound and could economically survive the termination of the provider agreement during the appeals process. It is true that the Sixth Circuit did observe, during its discussion of the "entirely collateral" exception, that the petitioner in that case was financially sound. Nothing in the opinion suggests, however, that the decision turns on something so simple as the petitioner's economic strengths, establishing one standard for a facility that is financially sound and another for those less economically secure. In any event, Bristol Health Care offers little evidence that it will be forced to close absent an injunction, except for the conclusory statement of its manager. It has provided no specific financial information, no evidence at the hearing, nor any explanation as to why the termination of an agreement affecting only 25% (26 of 101 of its residents) would, in fact, cause it to close.

[5] It does not appear, based on the Westlaw citation, that the *Peak* case was appealed.

Bristol Health Care is likely to fair no better on its argument that § 6501 of the Affordable Care Act, Pub. L. 111-148, provides a statutory right to Bristol Health Care not to be terminated from its participation in Medicaid until after it exhausts applicable appeals or the time for such appeals has lapsed. The petitioner appears to misread § 6501, which provides:

> **Termination of Provider Participation Under Medicaid If Terminated Under Medicare or Other State Plan**.
> Section 1902(a)(39) of the Social Security Act (42 U.S.C. 1396a(a)) is amended by inserting after "1128(A)" the following: "terminate the participation of any individual or entity in such program (if subject to such exceptions as are permitted with respect to exclusion under sections 1128(c)(3)(B) and 1128(d)(3)(B)). Participation of such individual or entity is terminated under Title XVIII or any other state plan under this Title[.]"

This Court agrees with the United States in its statement of interest that § 6501 has noting to do with nursing home non-compliance with Medicare and Medicaid conditions of participation and does not require that an individual or entity may be terminated from such participation only after all that provider's appeals are exhausted or the time frame in which to appeal has expired. The Court sees absolutely nothing in the text of § 6501 which suggests that it repeals or modifies in any way the existing requirements of federal law which require CMS and the State to take immediate remedial action when a nursing home is not in compliance with program requirements with immediate jeopardy to the health and safety of its residents prior to a hearing. 42 U.S.C. §§ 1395i-3(h)(4) and 1396r(h)(5); 42 C.F.R. §§ 488.400, 488.410, 488.330(e)(1)(ii) and (2)(ii).

Petitioner's complete lack of likelihood of success on the merits weighs heavily, even overwhelmingly, against the grant of an injunction.[6] Under these circumstances, it is likely unnecessary

---

[6] The Court notes it has not considered the likelihood that Bristol Health Care might succeed in its administrative appeal, something Judge Hull found significant in *Frontier Health*. It appears to the Court that the appropriate focus is on the likelihood of success in this case, not the administrative appeal. Again, however, Bristol Health Care has offered no evidence related to the facts which led to the May 1 letter from CMS.

17

for the Court to consider the remaining factors outlined above. Those factors, even when weighed cumulatively, however, still dictate denial of the petitioner's motion.

## B.  Irreparable Harm

Petitioner cites three types irreparable injury: (1) Injury to residents (2) injury to employees, and (3) injury to the facility itself. With respect to injury to residents, petitioner argues that its residents are ill and debilitated and that "[i]nvoluntary relocation of these residents could subject them to 'transfer trauma,' a well-documented and judicially recognized complex of physical and mental adverse effects--including death in some instances--caused by abrupt involuntary relocations of frail elderly persons from the facility that most perceive to be their home." [Doc. 1-1 at 15]. Relocation, they argue, may harm or sever existing relationships between residents and caregivers, make it more difficult for family members to visit residents and disrupt continuing treatment. As the State Defendants note, however, "[i]t is a dubious proposition" that residents would suffer more harm from relocation to other qualified nursing facilities than they would if they remain in a facility that has been found to be unable to sustain compliance with federal regulations and to have provided substandard care and immediate jeopardy to its residents." While residents may in fact suffer some trauma or anxiety from being relocated to unfamiliar surroundings, the Court simply cannot ignore the finding that Bristol Health Care has placed its residents in immediate jeopardy. Nothing suggests that the State Defendants will not work carefully with these residents and with their family members to minimize their discomfort and to avoid adverse consequences to the residents. More fundamentally, however, for the purposes of deciding this motion, alleged injury to residents alone does not establish the kind of irreparable harm necessary. *See O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 787-90 (1980) (even if they may suffer some harm as a result of their relocation, Medicaid beneficiaries have no right to continue to receive benefits for care in a nursing home that has been decertified. Decertification does not reduce or terminate a

residents's financial assistance, but merely requires the Medicaid beneficiary to use it for care at a different, certified facility); *see also Cathedral Rock*, 223 F.3d at 364 (nursing homes cannot rely solely on alleged harm to its residents in seeking an injunction).

Although the Court has not been able to find a case discussing harm to staff as a basis for establishing irreparable harm, the Court agrees with the State Defendants that it is likely that the staff can stand in no better position than the residents and that the staff, aside from its economic interest in employment at the facility, share the public interest that Medicad and Medicare recipients receive appropriate care in a certified facility.

Finally, Bristol Health Care's assertion of injury to itself does not demonstrate the type of irreparable harm necessary to establish entitlement to a preliminary injunction. There is no doubt that termination of the agreements is likely to have an adverse economic impact on the investors in Bristol Health Care. As the State Defendants point out, however, if negative business impact were sufficient to establish irreparable harm, the exhaustion requirement would likely be avoided in every case. That is particularly true in view of the fact that the Medicare/Medicaid statutes are designed to provide financial assistance to program beneficiaries and participants, not to the providers of care. *See Green v. Cashman*, 605 F.2d 945, 946 (6th Cir. 1979). In any event, Bristol Health Care's economic interests cannot outweigh the interests of the residents in receiving quality care that addresses their physical, mental and psychosocial needs. This factor, too, weighs against the petitioner's request.

### C.  Substantial Harm to the Defendants or Others

In essence, petitioner argued at oral argument that there is no risk of harm to the State Defendants here because, in any event, they will be obligated to pay the costs of required treatment under the Medicare and Medicaid programs. Focusing on the economic burden to the state and federal governments for providing care for Medicare and Medicaid residents misses the whole point of the

19

argument. As noted above, the whole purpose of the Medicare and Medicaid statutes is to provide assistance to the residents who have a clear entitlement to receive qualified care at a certified facility. It has been determined by appropriate governmental agencies that these residents are in immediate jeopardy, i.e. that the facility's deficiencies "immediately jeopardize the health or safety of its residents." The facility's history has been outlined above and the risk of maintaining the *status quo* is simply unacceptable under these circumstances. Not only do the findings of these agencies establish immediate jeopardy, the most recent surveys have revealed deficiencies that resulted in actual harm to residents and lack of prompt attention to those deficiencies by certain employees of the facility, including those at the upper echelon of management.

In addition, the imminent termination of federal funding on June 14, 2013, establishes that time is of the essence and that further delay, in and of itself, in relocating these residents might well result in increased risk of harm. At oral argument, petitioner argued that it is the responsibility of the State of Tennessee to take appropriate steps to ensure that sufficient money is available both from the federal government and state appropriations to provide for the care of these residents. The Court agrees with that general proposition; however, that obligation does not extend to assuring payment for services rendered at **this** facility.[7]

### D. The Public Interest

It is beyond dispute that the public has an interest in having public dollars spent for their intended purpose and in seeing that the beneficiaries of the Medicare/Medicaid programs receive quality care which meets their specific needs. Given the already existing mental and physical condition of these residents, it clearly is in the public interest that these individuals not be placed in further jeopardy of

---

[7] This Court is not unmindful of the argument that a preliminary injunction as proposed by the petitioner would likely impose a funding obligation on the State of Tennessee in violation of the doctrine of sovereign immunity. The Court agrees that the interest of the sovereign, the State of Tennessee, is a very serious one in this respect. For the purposes of deciding this motion, however, it is not the financial concerns of the state that are determinative in the Court's view.

increased harm in terms of their health or safety.  In fact, this Court can think of no public interest which would be served by the grant of a preliminary injunction in this case.

**V.  Conclusion**

This Court has balanced all necessary factors in considering whether to grant the preliminary injunction requested by the petitioner.  For the reasons set forth above, this Court concludes that the preliminary injunction is not warranted, the motion for a preliminary injunction is DENIED, and the temporary restraining order previously entered by the state court judge and extended by this Court shall be VACATED and of no force and effect upon the entry of this order.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
